**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Kenneth Hueske and Kathleen Hueske, | ) ) ) | |
| Plaintiffs, | ) ) | **ORDER GRANTING DEFENDANT'S** |
| vs. | ) ) | **MOTION FOR SUMMARY JUDGMENT** |
| State Farm Fire and Casualty Company, a foreign corporation, | ) ) ) | Case No. 1:06-cv-057 |
| Defendant. | ) | |

Before the Court is the Defendant's Motion for Summary Judgment filed on July 31, 2007. The Plaintiffs filed a response in opposition to the motion on September 5, 2007, and the Defendant filed a reply brief on September 10, 2007. For the reasons outlined below, the motion is granted.

## I.    BACKGROUND OF THE CASE

### A.    PROCEDURAL HISTORY

This is a coverage dispute involving the interpretation of certain exclusionary clauses in an insurance policy. This case arises out of a state district court action in which the plaintiffs, Kenneth Hueske and Kathleen Hueske, sued Fred Berger, the Berger Cattle Company (Berger), and Circle G Transport, LLC (Circle G) for damages allegedly resulting from the supply of contaminated corn syrup. The Hueskes had regularly purchased corn syrup from Berger as a feed supplement for the Hueskes' cattle. Berger had arranged for the corn syrup to be transported by Circle G and delivered to the Hueskes.

Berger was insured by State Farm Fire and Casualty Company (State Farm) which provided a defense to the state court action under a reservation of rights pending an investigation into whether

the claims asserted against the insured (Berger) were covered under the applicable insurance policy. State Farm investigated the matter and ultimately determined there was no coverage and withdrew its defense.   Thereafter, Berger entered into a <u>Miller-Shugart</u> settlement agreement[1] with the Hueskes and confessed to a judgment in the amount of $600,000.00.  As a result of the settlement, the Hueskes agreed to pursue collection solely against the insurer, State Farm.  Ultimately, the Hueskes settled their claims against Circle G.  The Hueskes then initiated this lawsuit in federal court against State Farm seeking a declaratory judgment that coverage existed under the applicable State Farm policies and for enforcement of the <u>Miller-Shugart</u> agreement.  On July 31, 2007, State Farm filed a motion for summary judgment contending that Berger's insurance policy did not provide coverage.

### B.     BERGER'S CATTLE OPERATION

Fred Berger is the sole owner of Fred Berger Limited, a cattle company that primarily operates throughout North Dakota and South Dakota.  <u>See</u> Deposition of Berger, Docket No. 30-4, pp. 6,10.  Berger testified that there are two aspects to his business operations - a "livestock order buying business," and a livestock production business.  <u>Id.</u> at 7-8.  Berger's "livestock order buying business" is a cattle-brokering business involving the purchase and sale of cattle for Berger and other ranchers.  Berger described his livestock production business as a ranching operation involving the "raising and putting pounds on cattle."  <u>Id.</u> at 12

In the summer of 2002, there was a shortage of cattle feed in the area.  In his efforts to acquire feed, Berger learned of a corn syrup product that could be mixed with standard feed to

---

[1]  <u>Miller-Shugart</u> settlements allow an insured to stipulate to a settlement of claims asserted by a plaintiff and stipulate that a judgment may be collected only from the proceeds of any insurance policy, with no personal liability to the defendant/insured.  <u>D.E.M. v. Allickson</u>, 555 N.W.2d 596, 602 (N.D. 1996); <u>see</u> <u>Miller v. Shugart</u>, 316 N.W.2d 729 (Minn. 1982).

supplement the rations provided to production livestock.  Berger testified that the corn syrup was a low cost supplement whose use was not widely known in North Dakota.  Id. at 21-22.  Berger contacted a plant in Minnesota that produced corn syrup and began purchasing corn syrup for his cattle operation.  Id. at 25-26.  Because the supply of the corn syrup was limited, Berger also contacted a feed brokerage firm to locate additional corn syrup and suppliers in South Dakota and Minnesota.

Although Berger initially purchased the corn syrup solely for his own cattle operation, in 2002 he also began selling corn syrup to other local ranchers for profit.  Id. at 35.  Each load of corn syrup was purchased from an out-of-state supplier by Berger and then delivered to other ranchers in North Dakota.  Each load of corn syrup that Berger purchased from an out-of-state supplier and delivered to ranchers in North Dakota was considered to be a separate purchase, a separate haul, and a separate delivery.  Berger said the reason he began selling corn syrup to other ranchers was to create enough of a profit to cover the cost of the corn syrup he used to feed his own cattle, or as he stated, to "[c]heapen it up."  Id.  Berger said that "I made money by um, selling it to them. . . . [I] put that money against my other feed."  See Deposition of Berger, Docket No. 30-11, p. 3.

The record reveals that Berger began purchasing corn syrup from out-of-state suppliers and having it delivered to local ranchers in late July 2002, and the sales continued through 2005.  In 2002, Berger purchased a total of approximately 2000 tons of corn syrup of which he personally used approximately 158 tons (less than 8 percent of the total tons of syrup purchased that year for his cattle operations).  See Docket No. 30-11, p. 19.  In other words, more than 92 percent of the total volume of corn syrup purchased by Berger in 2002 was sold to other North Dakota ranchers.  In 2003, Berger purchased a total of 4907.17 tons of corn syrup of which only 1027.95 tons

(approximately 20 percent) were used to feed Berger's cattle.  Id. at 26.  Thus, approximately 80 percent of the corn syrup Berger purchased in 2003 was sold to other ranchers.   In 2004, Berger purchased 5387.15 tons of corn syrup of which only 1885.43 tons (approximately 35 percent) were used in Berger's cattle operation.  Id. at 36.

Between 2002 and 2005, Berger purchased corn syrup for more than 15 different ranchers. The invoices in the record reveal that in 2002, there were 57 separate purchases of corn syrup delivered to other ranchers.  In 2003, Berger purchased and delivered more than 144 separate loads of corn syrup to other ranchers.

It is undisputed that Berger did not enter into any written agreements or contracts with the plants from whom the corn syrup was purchased, nor were there any written agreements or contracts with the ranchers to whom Berger was brokering the corn syrup.  In addition, there were no written agreements or contracts between Berger and Circle G, the transport company that Berger used for the delivery of corn syrup until May 2003.

The record reveals that the first delivery of corn syrup to the Hueskes occurred on September 11, 2002.  The last delivery of corn syrup took place on March 10, 2003.  See Deposition of Berger, Docket No. 30-4, p. 60.  Circle G was the entity that hauled corn syrup for Berger to various ranchers, including the Hueskes.  Circle G also "back hauled" residual fuel oil or diesel fuel from the Tesoro Petroleum Refinery in Mandan, North Dakota.  Berger said that as winter approached, there was concern that the corn syrup and the residual fuel being transported would thicken and adhere to the inside of the tanks on the transport trucks.  Berger said that he entered into an agreement with Circle G that required Berger to pay a higher fee per load of corn syrup to have the

transport tanks cleaned after each load was delivered.  <u>See</u> Deposition of Berger, Docket No. 30-4, pp. 55-57.

In December 2002, Circle G delivered a load of corn syrup to the Hueskes that was characterized as "smelly."  <u>See</u> Deposition of Kennth Hueske, Docket No. 30-3, pp. 57-58.  Hueske said that the load had a "terrible smell" and smelled like a "sewer."  <u>Id.</u> at 58.  In the spring of 2003, the Hueskes' cattle began to get sick and some of the females in the herd began aborting their calves. The Hueskes had the supply of corn syrup tested and it was discovered that the corn syrup was contaminated with diesel fuel.  <u>Id.</u> at 71.  The Hueskes also had tissue samples from the aborted calves tested and those samples disclosed the presence of diesel fuel.  <u>Id.</u> at 72.

The Hueskes then initiated a lawsuit against Berger and Circle G in state district court.  On December 2, 2005, Berger entered into a <u>Miller-Shugart</u> settlement agreement with the Hueskes, and the Hueskes also settled their claims with Circle G.  The Hueskes then commenced this lawsuit seeking a declaration that the State Farm Fire and Casualty Company insurance policies issued to Berger provided coverage for the losses sustained and that the <u>Miller-Shugart</u> settlement agreement was reasonable and enforceable.  On July 31, 2007, State Farm filed a motion for summary judgment contending that Berger's insurance policies expressly excluded any coverage for the losses sustained by the Hueskes.

### C.     BERGER'S INSURANCE POLICIES

The record reveals that Berger had purchased two separate insurance policies from State Farm - a Farm/Ranch Policy and an Umbrella Policy.  The Hueskes contend there is coverage under both policies.  The Umbrella Policy expired on November 1, 2002, the same date that the

Farm/Ranch Policy became effective.  See Docket Nos. 1-6, p. 19, and 1-3, p. 3.  The Hueskes began

purchasing corn syrup from Berger in September 2002.  State Farm contends that if the Umbrella

Policy is found to provide coverage, there is a question of fact as to whether any of the claimed

losses occurred during the applicable policy period.


## II.     STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and the moving

party is entitled to judgment as a matter of law.  F. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477

U.S. 317, 322 (1986). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of

summary judgment . . . against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden

of proof at trial."  Celotex, 477 U.S. at 322.  If the moving party has supported its motion for

summary judgment, the non-moving party has an affirmative burden placed on it to go beyond the

pleadings and show a genuine triable issue of fact.  Commercial Union Ins. Co. v. Schmidt, 967 F.2d

270, 271 (8th Cir. 1992).  However, the court considering a motion for summary judgment must

view the evidence in the light most favorable to the non-moving party who enjoys "the benefit of

all reasonable inferences to be drawn from the facts."  Vacca v. Viacom Broadcasting of Missouri,

Inc., et al., 875 F.2d 1337, 1339 (8th Cir. 1989).

## III.    LEGAL ANALYSIS

This action is based on diversity jurisdiction.  The Court will apply the substantive law of

North Dakota.  Paracelsus Healthcare Corp. v. Philips Med. Sys., 384 F.3d 492, 495 (8th Cir. 2004).

In the absence of controlling North Dakota law, the Court is obligated to predict what North Dakota

law is based on "relevant state precedent, analogous decisions, considered dicta, . . . and any other reliable data." Bockelman v. MCI Worldcom, 403 F.3d 528, 530 (8th Cir. 2005) (quoting BoBass v. Gen. Motors Corp., 150 F.3d 842, 846-47 (8th Cir. 1998))

It is well-established in North Dakota that the interpretation of an insurance policy is a question of law. Fisher v. American Family Mutual Ins. Co., 579 N.W.2d 599 (N.D. 1998). The standard for construing an insurance contract in North Dakota is as follows:

> Our goal when interpreting insurance policies, as when construing other contracts, is to give effect to the mutual intention of the parties as it existed at the time of contracting. We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction. "If coverage hinges on an undefined term, we apply the plain, ordinary meaning of the term in interpreting the contract." While we regard insurance policies as adhesion contracts and resolve ambiguities in favor of the insured, we will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage. We will not strain the definition of an undefined term to provide coverage for the insured.

ACUITY v. Burd & Smith Const., Inc., 721 N.W.2d 33 (N.D. 2006) (quoting Ziegelmann v. TMG Life Ins. Co., 607 N.W.2d 989 (N.D. 2000).

## A.     THE FARM/RANCH POLICY

The Farm/Ranch Policy acquired by Berger from State Farm provides general liability coverage through the following provision:

**COVERAGE L - FARM LIABILITY**

If a claim is made or a suit is brought against an insured for damages because of **bodily injury** or **property damage** to which this coverage applies, caused by an **occurrence**, we will:

1.      pay up to our limit of liability for damages for which the **insured** is legally liable;

***

<u>See</u> Farm/Ranch Policy, Docket No. 1-4, p. 9 (emphasis in original).

State Farm essentially agrees that "Coverage L" would apply because the Hueskes made a claim or suit against an insured (Berger) for damages because of property damage caused by an occurrence.  However, State Farm contends that there are specific clauses in the policy which exclude coverage, namely the "business pursuits" exclusion and the "professional services" exclusion.

### 1.      "BUSINESS PURSUITS" EXCLUSION

The Farm/Ranch Policy's "business pursuits" exclusion provides as follows:

1.      **Coverage L** - **Farm Liability** and **Coverage M - Medical Payments to Others** do not apply to:

***

      b.      **bodily injury** or **property damage** arising out of **business** pursuits of any **insured** or the rental or holding for rental of any part of any premises by any **insured**.  This exclusion does not apply:

           (1)      to activities which are ordinarily incidental to **non-business** pursuits;

           (2)      to farming, including the operation of roadside stand maintained principally for the sale of an **insured's** farm products;

***

<u>See</u> Farm/Ranch Policy, Docket No. 1-4, p. 11 (emphasis in original).  The policy defines "business" as a "trade, profession or occupation other than farming."  <u>See</u> Farm/Ranch Policy, Docket No. 1-3, p. 6.

8

North Dakota has not yet adopted any criteria for determining what activities constitute "business pursuits" for purposes of excluding coverage under an insurance policy. The general view is that to constitute a "business pursuit," the activity must be continuous or regular in nature, and it must be an activity engaged in for the purpose of earning a profit or compensation. See Construction and Application of "Business Pursuits" Exclusion Provision in General Liability Policy, 35 ALR 5th 375, § 3[b] (1996). A majority of the courts have adopted a two-part test to determine if an activity constitutes a "business pursuit," namely, whether the activity was (1) continuous; and (2) motivated by profit. Horace Mann Ins. Co. v. Combs, 626 F. Supp. 354, 357 (S.D. Iowa 1986) (recognizing the lack of controlling authority in Iowa and adopting the majority test for what constitutes a business pursuit). The Court finds the above-cited authority to be persuasive and is convinced that, if presented with the issue, the North Dakota Supreme Court would adhere to the majority rule and hold that a "business pursuit" is an activity that is continuous in nature and motivated by profit.

a)      **CONTINUOUS ACTIVITY**

For the purpose of the "business pursuits" exclusion, courts have defined "continuity" in terms of "a customary engagement or stated occupation." See U.S. Fidelity & Guar. Co. v. Heltsley, 733 F. Supp. 1418, 1421 (D. Kan. 1990) (applying Kansas law); Horace Mann Ins. Co. v. Combs, 626 F. Supp. 354, 357 (S.D. Iowa 1986).

The record reveals that during the last five months of 2002, Berger purchased and arranged for the delivery of at least 57 separate loads of corn syrup to other ranchers, or a total of approximately 2000 tons. In 2002, Berger purchased a total of approximately 158 tons of corn syrup

9

for his own cattle operations.  More than 92 percent of the corn syrup purchased by Berger in 2002 was sold to other North Dakota ranchers.  In 2003, Berger arranged for the purchase and delivery of more than 144 separate loads of corn syrup, which amounted to 4907 tons of corn syrup of which Berger personally used approximately 1027 tons.  In other words, approximately 80 percent of the corn syrup purchased by Berger in 2003 was sold and delivered to other ranchers.

The Hueskes contend that Berger's purchase, sale, and delivery of corn syrup to other ranchers was a short-term activity that was designed to weather the shortage of quality hay.  The Court finds that Berger's involvement in the purchase, sale, and delivery of corn syrup to other ranchers in 2002-2003 more than satisfies the continuity requirement of the "business pursuits" exclusion.

The Hueskes cite to <u>Randolph v. Ackerson</u>, 310 N.W.2d 865 (Mich. App. 1981), as an example of a case where the court held that the activity of an individual selling goods was not continuous as defined under the "business pursuits" exclusion in an insurance policy.  In <u>Randolph</u>, a farmer bought an old barn for the purpose of disassembling it and selling the wood.  A purchaser of the wood was injured and sued the farmer and the insurer.  The court held that the "business pursuits" exclusion did not apply because the transaction was the only time that the farmer had ever purchased a building to disassemble and sell the wood.  The Court finds <u>Randolph</u> to be distinguishable.  The record clearly establishes that Berger's involvement in the purchase, sale, and delivery of corn syrup to other ranchers was not an isolated, one-time occurrence.  Instead, Berger became involved in a multitude of transactions with numerous other ranchers involving the sale and delivery of thousands of tons of corn syrup over several years.  This activity was clearly a continuous business transaction rather than an isolated event.

Other courts that have analyzed the continuity requirement under the "business pursuits" exclusion have found that significantly less business activity was sufficient to satisfy the continuity requirement. In Martin v. Shepard, 365 A.2d 971 (Vt. 1976), Shepard conducted his primary business of farming on about 480 acres of land. Shepard also raised horses that he entered in competitive shows and races. The racing season lasted two months and during a fourteen-month period of time, Shepard entered approximately thirty races. The court held that based on the ongoing nature of the activity, horse racing was a business pursuit rather than a farming activity. In Heggen v. Mountain West Farm Bureau Mutual Ins. Co., 715 P.2d 1060 (Mt. 1986), Eickhorn, the insured defendant, constructed a roping arena on his land and held three to four steer roping contests each year. The court held that three to four steer roping contests in consecutive years was a regular and continuous level of activity which constituted a business pursuit. Id. at 1063.

Based on the undisputed facts in the record, the Court finds that Berger's brokering of corn syrup during the years 2002 and 2003 was a regular and continuous business activity involving the sale and delivery of thousands of tons of corn syrup to other ranchers. Therefore, the first element of the "business pursuits" exclusion has been satisfied.

### b)   PROFIT MOTIVE

It is clear from the record that Berger intended to earn a profit from the brokering of corn syrup. See Deposition of Berger, Docket No. 30-11, p. 3; and Deposition of Berger, Docket No. 30-4, p. 35. Although the Hueskes contend that Berger's brokering of corn syrup was conducted simply to minimize the cost of the corn syrup used by Berger in his own cattle operation, it is clear and undisputed that Berger was brokering the corn syrup to earn money.

11

Courts that have examined the level of activity required under the profit element of the "business pursuits" exclusion test have said that all that is required is a profit motive, and not an actual profit.  See Wiley v. Travelers Ins. Co., 534 P.2d 1293, 1295 (Okla. 1974).  The Court finds that Berger's brokering of corn syrup was a business venture undertaken with the motivation of earning a profit.  As a result, the Court finds that the second element of the "business pursuits" exclusion is met.  Even though the Court finds that Berger's activities fall under the "business pursuits" exclusion, the Farm/Ranch Policy also provides for several exceptions to the "business pursuits" exclusion, each of which will be addressed.


### 2.   EXCEPTIONS TO THE "BUSINESS PURSUITS" EXCLUSION

Berger's Farm/Ranch policy provides four exceptions to the "business pursuits" exclusion that, if met, would constitute a covered activity under the insurance policy even though the "business pursuits" exclusion is satisfied.  The Hueskes contend that two of the exceptions apply.  The first exception is that the exclusion does not apply to activities that are "ordinarily incidental to non-business pursuits."  See Farm/Ranch Policy, Docket No. 1-4, p. 11.  The second exception provides that the exclusion does not apply to farming.


### a)   ACTIVITIES ORDINARILY INCIDENTAL TO NON-BUSINESS PURSUITS

The first exception to the "business pursuits" exclusion is for activities which are "ordinarily incidental to non-business pursuits."   The Hueskes contend that Berger handled all of the transactions relating to the brokering of corn syrup through the Berger Cattle Company and he did not separately list the profit from the brokering of corn syrup on his tax returns.  The Hueskes argue

12

that these facts support the conclusion that Berger did not consider the brokering of corn syrup to be a separate business, but rather an extension of his cattle business.

Berger said that his business operations consisted of two aspects - livestock production and livestock brokering. Berger said that the brokering of corn syrup was similar to livestock brokering. See Deposition of Berger, Docket No. 30-4, pp. 26-27. Berger also said that he believed the brokering of corn syrup was part of his cattle operation because it created a profit for that business.

> Q.      Brokering [corn syrup] to other individuals isn't part of your operation, but by getting a profit it lessens expenses to your operation?
>
> A.      So it makes it part of my operation.
>
> Q.      So anything that you do that creates a profit is part of your operation?
>
> A.      Yes.

The Court finds that Berger's use of profits generated from the sale of corn syrup to other ranchers, to lessen the expenses associated with his own cattle operation, does not render the brokering of corn syrup a part of or incidental to his farming and cattle operation. The Court finds as a matter of law that the purchase, sale, and delivery of thousands of tons of corn syrup to other ranchers does not equate with an activity "ordinarily incidental to non-business pursuits" that would trigger coverage in this case. Thus, this exception to the "business pursuits" exclusion does not apply.

**b)      FARMING EXCEPTION**

The Hueskes also contend that the farming exception to the "business pursuits" exclusion is triggered and invokes coverage in this case. The insurance policy does not define the term "farming." However, the Hueskes do not analyze whether Berger's activities fit into the definition

13

of "farming." Rather, they contend that Berger did not consider or perceive the brokering of corn syrup to be separate and distinct from his general farming operations.

The Court finds as a matter of law that the brokering of thousands of tons of supplemental feed/corn syrup that was purchased by Berger from out-of-state suppliers on a continual basis for sale and delivery to other ranchers for profit, falls outside of the scope of "farming" under the terms and conditions of Berger's Farm/Ranch insurance policy. As a result, the Court finds that the farming exception to the "business pursuits" exclusion has no application to the facts of this case.

### B.    THE UMBRELLA POLICY

Berger's Umbrella Policy purchased from State Farm provided personal liability coverage and defined the scope of coverage as follows:

> **Coverage L - Personal Liability**.   If you are legally obligated to pay damages for a **loss**, we will pay your **net loss** minus the **retained limit**. Our payment will not exceed the amount shown on the **Declarations** as Policy Limits - Coverage L - Personal Liability.

See Umbrella Policy, Docket No. 1-6, p. 5 (emphasis in original).

State Farm disputes that coverage exists under the Umbrella Policy and contends that if coverage is found to exist, there are questions of fact as to whether any of the claimed losses occurred during the policy period. If the exclusions contained in the Umbrella Policy are triggered, the Court need not reach the question of whether the claimed losses occurred within the policy period. Thus, the Court will analyze the exclusions under the Umbrella Policy to determine the necessity of resolving possible questions of fact. State Farm contends that two policy exclusions, the "professional services" exclusion and the "business pursuits" exclusion expressly exclude coverage. The exclusions provide as follows:

14

We will not provide insurance:

\*\*\*

5.      for any **loss** caused by providing or failing to provide a professional service.

6.      for any loss caused by your **business** operations or arising out of **business property**:

<u>See</u> Umbrella Policy, Docket No. 1-6, p. 6 (emphasis in original).  The term "business property" is defined in the definitions section of the Umbrella Policy and the term "business" is defined in an endorsement.  The definitions provide as follows:

3.      "**business property**" means premises on which a business is conducted, or property rented or held for rental in whole or in part to others.

"**business**" means a trade, profession or occupation other than farming.

<u>Id.</u> at 3, 12.

The exclusions contained in the Umbrella Policy are essentially the same exclusions previously identified and addressed in the Farm/Ranch Policy - a "business pursuits" exclusion and a "professional services" exclusion.  The same reasoning and conclusion for the application of the "business pursuits" exclusion contained in the Farm/Ranch Policy applies to the exclusions contained in the Umbrella Policy.  The Court finds that the "business pursuits" exclusion is triggered and coverage for the claimed losses does not exist under the Umbrella Policy as a result of the exclusion.

## IV.   <u>CONCLUSION</u>

The Court finds as a matter of law that Fred Berger's brokering of thousands of tons of corn syrup to other customers/ranchers was a regular and continuous business activity that was profit-

motivated and constitutes a "business pursuit."  The Court further finds as a matter of law that Berger's brokering of corn syrup does not fall within any of the exceptions to the "business pursuits" exclusion, and that such activities are expressly excluded from coverage under Berger's Farm/Ranch Policy and Umbrella Policy acquired from State Farm.  For the reasons set forth above, State Farm's Motion for Summary Judgment (Docket No. 27) is **GRANTED**.

**IT IS SO ORDERED.**

Dated this 1st day of October, 2007.

_/s/ Daniel L. Hovland_____
Daniel L. Hovland, Chief Judge
United States District Court